# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Target Telephone 1, Target Telephone 2, and the Target iPad , currently in law enforcement custody, as further described in Attachment A

Case No.24-883M(NJ)

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 7/11/2024 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Nancy Joseph.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 12/24/2024.

Date and time issued: 6/27/2024 @ 12:48 p.m.

Nancy Joseph
*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________________________
*Executing officer's signature*

____________________________________
*Printed name and title*

<u>**ATTACHMENT A**</u>

The properties to be searched are described as follows:

a. a blue iPhone in a clear dark case, hereinafter identified as the "**Target Telephone 1**";

b. a blue iPhone in a case with an Anime character, hereinafter identified as the **"Target Telephone 2"**; and

c. a black iPad, hereinafter identified as the "**Target iPad.**"

**Target Telephone 1, Target Telephone 2,** and the **Target iPad** are currently located at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin.

This warrant authorizes the forensic examination of **Target Telephone 1, Target Telephone 2,** and the **Target iPad** for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1. All records on **Target Telephone 1**, **Target Telephone 2**, and the **Target iPad** are described in Attachment A that relate to violation of Title 21, United States Code, §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and involve Stephen REESE since January 2016, including, but not limited to:

a. lists of customers and related identifying information;

b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c. any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

d. any information recording schedule or travel;

e. all bank records, checks, credit card bills, account information, and other financial records;

f. Photographs and/or videos depicting possession of drugs;

g. Any evidence related to either the ownership, purchase, or possession of drugs;

h. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

i. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of **Target Telephone 1, Target Telephone 2,** and the **Target iPad**;

2. Evidence of user attribution showing who used or owned **Target Telephone 1, Target Telephone 2,** and the **Target iPad** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Target Telephone 1, Target Telephone 2, and the Target iPad , currently in law enforcement custody, as further described in Attachment A

Case No. 24-883M(NJ)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the ______________ District of ______________________ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Distribution and possession with the intent to distribute controlled substances; and Conspiracy to distribute and possess with the intent to distribute controlled substances. |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☑ Delayed notice of 180 days *(give exact ending date if more than 30 days:* 12/24/2024 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

KOSTANDEAN KAZAMIAS
Digitally signed by KOSTANDEAN KAZAMIAS
Date: 2024.06.26 14:53:51 -05'00'

*Applicant's signature*

Kostandean P. Kazamias, DEA SA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 6/27/2024

*Judge's signature*

City and state: Milwaukee, WI

Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH

I, Kostandean P. Kazamias, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration (DEA) and have been so employed since 2020. I am currently assigned to the Milwaukee District Office, Group 63. My duties include the investigation of drug trafficking organizations and violations of federal narcotics and money laundering laws, including, but not limited to offenses defined by 21 U.S.C. §§ 841, 843, and 846, and 18 U.S.C. §§ 1956 and 1957. I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, and Section 2516.

3. I have received training in the area of narcotics investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I

have participated in numerous investigations involving violations of state and federal narcotics laws. I have participated or assisted in numerous federal and state search warrants for narcotic related offenses. I have experience in the investigation, apprehension, and prosecution of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.

4. I have aided and participated in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws. These warrants involved the search of locations including: residences of targets, their associates, and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other case agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Throughout this affidavit, reference will be made to case agents or officers. Case agents or officers are those federal, state, and local law enforcement officers who

have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7. The properties to be searched are described as follows:

a. a blue iPhone in a clear dark case, hereinafter identified as "**Target Telephone 1**";

b. a blue iPhone in a case with an Anime character, hereinafter identified as **"Target Telephone 2"**; and

c. a black iPad, hereinafter identified as the "**Target iPad**."

**Target Telephone 1, Target Telephone 2,** and the **Target iPad** are currently located at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin.

8. The applied-for warrant would authorize the forensic examination of **Target Telephone 1, Target Telephone 2,** and the **Target iPad** for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9. The Drug Enforcement Administration (DEA) and the North Central High Intensity Drug Trafficking Area (HIDTA) are currently investigating the drug trafficking activities of a multi-state Drug Trafficking Organization (DTO). During the course of the investigation case agents have identified multiple individuals involved in supplying multi-kilogram quantities of narcotics to Milwaukee, Wisconsin, and other areas. Evidence gathered during the course of this investigation reflects that Cornel C. CARNEGIE and Marcel D. OXLEY SR. are responsible for, and coordinating the

movement of, multi-kilogram quantities of narcotics from California. The evidence further reflects that Aurion M. OXLEY, Tamara D. MONTGOMERY, Marcel D. OXLEY JR., Vincent L. NICHOLSON JR., and others work with OXLEY SR. and CARNEGIE to facilitate the movement of narcotics to, and store narcotics at, various stash locations in Milwaukee, Wisconsin. Case agents have discovered that at least some of the narcotics are transported via commercial airlines from California to Chicago, Illinois, and then to Milwaukee, Wisconsin. The narcotics are then supplied to multiple individuals in the Milwaukee area, to include Anthony T. WILKS, who distributes the narcotics from the restaurant and bar he operates known as Jack's Executive Bistro, located at 4923 W. Villard Avenue, Milwaukee, Wisconsin.

10. During the course of this investigation, phone records and surveillance footage led agents to believe that Stephen REESE, an employee at the LAX airport, was assisting the DTO by bringing suspected controlled substances into LAX's sterile area beyond the security checkpoint and thereafter providing the controlled substances to other DTO members who fly them to Chicago, IL. Further, over the course of the investigation, case agents also identified Michelle CARTER as a member of the DTO that facilitates the movement of narcotics though commercial air travel.

11. Surveillance footage and phone records reflect that REESE met with DTO members at LAX and was believed to have exchanged "SwissGear" style backpacks with them on multiple occasions.

**Stephen REESE Helps to Smuggle Narcotics in April and May 2024**

12. More specifically, REESE met with a DTO associate during the early

morning hours of April 11, 2024. Through United Airlines flight records, case agents learned that a previously identified courier of the DTO, Kristen CENDEJAS, had flown from LAX to Chicago, IL on April 11, 2024. Case agents reviewed LAX surveillance footage from April 11, 2024. Surveillance footage depicted REESE meeting with CENDEJAS at approximately 4:14 a.m. PST, and the two appeared to exchange black colored "SwissGear" style backpacks in Terminal 6, near the area of elevator T6-9.

13. Before this exchange, REESE, at (323) 812-2879, received calls from (669) 322-6506 on April 10, 2024 at approximately 11:11 p.m. PST, and April 11, 2024 at approximately 3:28 a.m. and approximately 4:13 a.m. PST, moments before REESE and CENDEJAS met with each other. Initially, case agents believed (669) 322-6506 was another phone being used by CENDEJAS. However, on a later date while physically surveilling CENDEJAS, case agents called (669) 322-6506 and a male voice answered. Therefore, case agents believe the user of (669) 322-6506, FNU LNU, contacted REESE to coordinate the exchange of backpacks with CENDEJAS.

14. Later on April 11, 2024, surveillance footage from ORD reflected CARTER being dropped off by a vehicle at Terminal 2, at which point CARTER entered Chicago O'Hare Airport and subsequently walked inside an airport bathroom at approximately 12:39 p.m., at the same time CENDEJAS was in this same bathroom. CARTER entered the bathroom with what appeared to be an empty backpack and exited carrying a backpack that appeared to contain items. Case agents believe that CARTER and CENDEJAS switched backpacks while inside the bathroom. CARTER then re-entered the vehicle she

came in and traveled back to Milwaukee.

15. Based on their familiarity with this investigation, case agents believe REESE carried a backpack containing narcotics through airport security at which point he provided it to CENDEJAS. CENDEJAS then flew the narcotics from LAX to ORD where, upon arrival, CENDEJAS provided the narcotics to CARTER who transported them to Milwaukee.

16. Case agents reviewed LAX surveillance footage from May 12, 2024, which depicted REESE meeting with a second previously identified member of the DTO, Marcel OXLEY JR., and appeared to exchange black colored "SwissGear" style backpacks in Terminal 6, near the area elevator T6-9.

17. Additionally, case agents reviewed LAX surveillance footage from May 13, 2024, which depicted REESE again meeting with CENDEJAS in the same area of Terminal 6, near the area of elevator T6-9. REESE and CENDEJAS appeared to exchange black colored "SwissGear" style backpacks during this encounter.

18. Based on their training, experience, and familiarity with this investigation, case agents believe that on both dates, REESE met with the DTO associates to bring narcotics past security and conduct narcotics transactions.

**Seizure of 10 Kilograms of Cocaine**

19. On May 10, 2024, the Honorable Stephen C. Dries, United States Magistrate Judge, Eastern District of Wisconsin, signed a warrant authorizing the collection of data pertaining to the location of multiple cellular telephones, to include REESE's cell phone ((323) 812-2879) and CARTER's cell phone ((414) 888-9090).

20. Based on electronic and physical surveillance, case agents were aware OXLEY SR. was at ORD and travelled to Milwaukee, WI on June 2, 2024.

21. During the morning hours of June 4, 2024, court-authorized location data for OXLEY SR.'s phone and CARTER's phone revealed both traveled from Milwaukee to the area of ORD, seemingly together. At approximately 6:32 a.m., OXLEY SR.'s phone and at 6:38 a.m., CARTER's phone were in the immediate vicinity of ORD. As time passed, OXLEY SR.'s phone traveled northbound to Milwaukee while CARTER's phone remained at ORD. Therefore, case agents believed OXLEY SR. drove CARTER to ORD so she could take a flight while he returned to Milwaukee.

22. Flight records and location data for CARTER's phone revealed CARTER, after a brief layover at the Salt Lake City International Airport, flew into the Long Beach (CA) Airport at approximately 2:07 p.m.

23. Later that same day, at approximately 8:05 p.m. and 8:06 p.m. PST, REESE, at (323) 812-2879, received calls from FNU LNU using (669) 322-6506. Beginning at approximately 8:37 p.m. PST, CARTER's phone was in the immediate vicinity of LAX where it stayed. At approximately8:43 p.m. PST, REESE's phone was also in the immediate vicinity of LAX until approximately 9:51 p.m. PST. At approximately 8:52 p.m., 9:01 p.m., and 9:13 p.m. PST, REESE, using (323) 812-2879, called FNU LNU at (669) 322-6506.

24. As with the April 11, 2024 exchange between REESE and CENDEJAS, case agents believe REESE was in telephone contact with FNU LNU at (669) 322-6506 to coordinate the exchange of a backpack containing narcotics with CARTER.

25. Case agents contacted an American Airlines employee who advised that CARTER had a reservation to depart on American Airlines flight 1564, LAX – Chicago, IL (ORD) – Pittsburg (PIT), with a delayed departure time of 1:12 a.m. (which would be on June 5, 2024), from Terminal 5, gate 53A.

26. Case agents also contacted Los Angeles World Airport (LAWA) Badging office, who advised that REESE had used his LAWA-issued badge to enter through Los Angeles World Airport ACAMS doors that lead to the Terminal 6 departure level. However, REESE was supposed to be on a day off from his work shift at LAX.

27. Case agents reviewed surveillance footage from within LAX and observed the following:

a. At approximately 9:03 p.m. PST, REESE was in the area of elevator T6-9, lower-level / tunnel area. REESE was observed to be in possession of a black colored backpack and sat near the area of Gate 67.

b. At approximately 9:10 p.m. PST, CARTER completed the Transportation Security Administration (TSA) screening process. CARTER was in possession of a black colored "SwissGear" Scan Smart TSA laptop backpack.

c. At approximately 9:14 p.m. PST, case agents observed CARTER reach the area of elevator T6-9. REESE, while in possession of the dark colored backpack, appeared to see CARTER near the elevator, then walked through a door that leads to the lower-level / tunnel area. Approximately a few seconds later, CARTER walked into elevator T6-9, which also leads to the lower level / tunnel area.

d. At approximately 9:16 p.m. PST, REESE took the escalator from the

lower-level tunnel area to the departure level. REESE was then observed walking northbound through the departure level and eventually exited the terminal and walked to the area of the LAX parking structure P5 / P6. Surveillance footage captured that REESE was in possession of a similar backpack (black colored "SwissGear" Scan Smart TSA Laptop backpack) as CARTER's. Based on the zipper configuration on the backpack it appeared to be the same backpack CARTER possessed before meeting with REESE in the lower level / tunnel area.

e. At approximately 9:16 p.m. PST, CARTER walked from the same area where REESE took the escalator, lower-level / tunnel area. Surveillance footage captured CARTER's black colored "SwissGear" Scan Smart TSA Laptop backpack, which appeared to be different than before meeting REESE. It appeared to case agents that the backpack was now weighed down and the zipper configuration was not the same.

28. Based on their familiarity with this investigation, case agents believed REESE and CARTER swapped backpacks.

29. At approximately 11:20 p.m. PST, case agents responded to Terminal 5, Gate 53, to locate CARTER before her departure flight. Case agents located CARTER laying down on the ground behind the American Airlines ticket counter near Gate 53A. Case agents then observed what appeared to be the same black colored "SwissGear" backpack from surveillance footage, which was sitting on the ground, approximately 6 inches away from CARTER. No other passengers were in the immediate area of the backpack.

30. At approximately 11:48 p.m. PST, case agents exposed narcotic detection K-

9 "Casey" to the general area where CARTER was laying down. Case agents advised that K-9 "Casey" had alerted to the black colored "SwissGear" backpack sitting next to CARTER. Case agents, who were in plainclothes, approached CARTER. Case agents tapped CARTER on her shoulder to wake her up. Case agents displayed to CARTER their DEA credentials and identified as law enforcement. Case agents explained to CARTER that a K-9 had alerted to the scent of narcotics coming from her black colored "SwissGear" backpack that was sitting next to her. Case agents asked CARTER if she was willing to accompany them to the LAXNTF office to discuss the contents inside her black colored "SwissGear" backpack. CARTER stood up, picked up her black colored handbag with multicolor lettering and the black colored "SwissGear" backpack and agreed to walk back to the LAXNTF office. While walking to the LAXNTF office, CARTER maintained possession of her handbag and backpack. CARTER asked case agents how long it would take because she needed to get back to her child and her sick mother. Case agents explained to CARTER that it was a 5-minute walk to the LAXNTF office.

31. While at the LAXNTF office, case agents explained to CARTER that a narcotic K-9 had shown interest on her backpack. Case agents asked for consent to search the bags in her possession. CARTER verbally agreed and signed a DEA Consent Form giving case agents consent to search her bags.

32. Case agents searched the black colored handbag with multicolored lettering and discovered it contained miscellaneous women's clothing, toiletries and shoes. The Handbag also contained two Delta Airlines boarding passes dated June 4, 2024, for Delta flight 2426, ORD – SLT and Delta flight 855, SLT – Long Beach, both under the name of

"CARTER/MICHELLE."

33. Case agents searched a pink colored coin purse which contained a Wisconsin Identification Card No. C636-5419-7808-09 and Visa Debit Card, both under the name of Michelle CARTER.

34. Case agents searched the black colored "SwissGear" backpack. Case agents opened the main compartment of the backpack and discovered 10 kilogram-sized vacuum-sealed packages. As an officer was taking out each vacuum-sealed package, CARTER spontaneously stated the following: "what the fuck is that, that is not my bag", "what is that, that's drugs, that's what the dog was smelling." CARTER claimed she had shopping bags and items from Ross, Walmart, and Target. CARTER also said, "What is that, that don't look like no weed."

35. Case agents advised CARTER that they would be conducting a test of the substance inside of the packages. Using the TruNarc Raman spectrometer handheld device, case agents conducted a presumptive test of the white powdery substance inside of one of the kilogram sized packages. The presumptive test of the white powdery substance tested positive for Cocaine Hydrochloride. In total, the cocaine weighed approximately 11.76 kilograms (including the packaging).

**Identification of REESE's Vehicle**

36. On May 6, 2024, case agents met with ABM - Los Angeles International (LAX) Central Terminal Group, Field Operations Manager, who provided case agents with REESE's LAX parking records for the period of April 8, 2024 thru May 6, 2024. Per the ABM LAX parking records, REESE parked two different vehicles during his work

shifts at LAX and during the time frame indicated above:

a. California License Plate: 8YPK431, 2018 Porsche (i.e., the SUBJECT VEHICLE), Registered Owner: Stephen REESE, Registration Valid: 2-14-2024 thru 2-14-2024, address: 4182 3/4 Leimert Blvd, Los Angeles, Ca 90008; and

b. California License Plate: 74248T2, 2002 Chevrolet, Registered Owner: Israel Galarza, Registration Valid: 12-31-2022 thru 12-31-2023, 9301 Shirley Ave, Apt 18, Northridge, Ca 91324. This vehicle was used by REESE on two different occasions between April 13, 2024 and April 15, 2024.

37. On June 7, 2024, case agents met with ABM-LAX parking, who provided REESE's parking records for the SUBJECT VEHICLE. Records and a printed digital photo of the SUBJECT VEHICLE indicated that REESE parked in the LAX parking structure P5 / P6 during the time frame that he met CARTER to swap the backpack containing the narcotics. The SUBJECT VEHICLE entered the P5 and P6 parking structure at approximately 8:49 p.m. PST, then exited the parking structure at approximately 9:29 p.m. PST, leading case agents to believe that REESE used the SUBJECT VEHICLE to transport the backpack with drugs from an unknown stash location to LAX. Moreover, case agents reviewed surveillance footage, which captured REESE walking from LAX Terminal 6 to the area of the LAX parking structure P5 /P6 minutes after meeting with CARTER inside of Terminal 6.

38. On June 18, 2024, the Honorable Michael R. Wilner, United States Magistrate Judge, Central District of California, authorized a search warrant for Stephen REESE's 2018, dark blue colored Porsche, the SUBJECT VEHICLE.

**REESE Arrest and Seizure of Devices**

39. On June 20, 2024, at approximately 3:20 a.m. PST, case agents established surveillance at LAX parking structure 6, near section 2A, stall 34, where REESE's dark blue colored Porsche, bearing California License Plate 8YPK431, was parked. Court-authorized location data for REESE's cellular telephone, (323) 812-2879, revealed it was in the vicinity of LAX.[1] At approximately 5:25 a.m. PST, case agents observed REESE exit his vehicle. Case agents approached REESE and advised him that investigators wanted to speak with him. REESE was placed under arrest and escorted to the LAXNTF office. Case agents conducted a search of REESE incident to his arrest and discovered two mobile devices on his person: a blue iPhone in a clear dark case, **Target Telephone 1**, and a blue iPhone in a case with an Anime character, **Target Telephone 2**.

40. At approximately 6:20 a.m. PST, case agents executed the search warrant on REESE's dark blue colored Porsche, bearing California License Plate 8YPK431. Case agents discovered in the back seat of the vehicle two black colored "SwissGear" style backpacks. One backpack contained a light brown and white colored blanket, black and white colored woman's pants, a black & grey colored jacket, and a brown colored woman's top. The other backpack contained miscellaneous items along with a black colored table iPad, **Target iPad**. Both backpacks were very similar in appearance to the

[1] On June 17, 2024, the Honorable Stephen C. Dries, signed a warrant authorizing the collection of data pertaining to the location of multiple cellular telephones, to again include REESE's cell phone.

backpacks REESE and DTO members were believed to have exchanged.

41. Case agents advised REESE of his *Miranda* Rights, reading verbatim from the DEA Advice of Rights form. REESE advised that he understood his rights and, both verbally and in writing, indicated he wished to waive his rights. REESE acknowledged that the two cellular telephones found in his possession were his and advised that the passcode to each was the same, 226400. REESE also said the iPad found in his Porsche was his and that the passcode for the **Target iPad** was also 226400. Case agents verified that passcode 226400 opened all three devices. With REESE's consent, case agents also opened the two telephones and discovered **Target Telephone 1** was assigned (323) 812-2879 and **Target Telephone 2** was assigned (213) 330-5580. Case agents then locked each device without searching them.

42. **Target Telephones 1** and **2** and the **Target iPad** are currently in the lawful possession of the DEA. It came into the DEA's possession upon seizure incident to REESE's arrest. **Target Telephones 1** and **2** and the **Target iPad** are currently in storage at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin. In my training and experience, I know that **Target Telephones 1** and **2** and the **Target iPad** have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when **Target Telephones 1** and **2** and the **Target iPad** first came into the possession of the DEA.

## TECHNICAL TERMS

43. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning

System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending, and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

44. Based on my training, experience, and research, I know that **Target Telephone 1, Target Telephone 2,** and the **Target iPad** have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

45. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

46. There is probable cause to believe that things that were once stored on **Target Telephone 1, Target Telephone 2,** and the **Target iPad** may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file

does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

47. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **Target Telephone 1, Target Telephone 2,** and the **Target iPad** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **Target Telephone 1, Target Telephone 2,** and the **Target iPad** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal

information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

48. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **Target Telephone 1, Target Telephone 2,** and the **Target iPad** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

49. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION AND DELAYED NOTICE REQUEST

50. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of **Target Telephone 1, Target Telephone 2,** and the **Target iPad** described in Attachment A to seek the items described in Attachment B.

51. This is part of an ongoing investigation into a multi-state DTO distributing fentanyl, cocaine, methamphetamine, and other controlled substances in the southeast Wisconsin area. This investigation hopes to identify all of the local members, any out of state members, any out of country members, and the sources of supply of the controlled substances being brought into southeast Wisconsin. The investigation will continue until all appropriate law-enforcement investigative methods have been exhausted.

52. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 180 days after the collection authorized by the warrant has been completed. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the owner or user of **Target Telephone 1, Target Telephone 2,** and the **Target iPad** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy

evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

**ATTACHMENT A**

The properties to be searched are described as follows:

a. a blue iPhone in a clear dark case, hereinafter identified as the "**Target Telephone 1**";

b. a blue iPhone in a case with an Anime character, hereinafter identified as the **"Target Telephone 2"**; and

c. a black iPad, hereinafter identified as the "**Target iPad.**"

**Target Telephone 1, Target Telephone 2,** and the **Target iPad** are currently located at North Central HIDTA, 11548 West Theo Trecker Way, West Allis, Wisconsin.

This warrant authorizes the forensic examination of **Target Telephone 1, Target Telephone 2,** and the **Target iPad** for the purpose of identifying the electronically stored information described in Attachment B.

<u>**ATTACHMENT B**</u>

1. All records on **Target Telephone 1**, **Target Telephone 2**, and the **Target iPad** are described in Attachment A that relate to violation of Title 21, United States Code, §§ 841(a)(1) (distribution of and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances), and involve Stephen REESE since January 2016, including, but not limited to:

a. lists of customers and related identifying information;

b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c. any information related to co-conspirators and sources of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

d. any information recording schedule or travel;

e. all bank records, checks, credit card bills, account information, and other financial records;

f. Photographs and/or videos depicting possession of drugs;

g. Any evidence related to either the ownership, purchase, or possession of drugs;

h. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

i. All data, communications, information, and records, in whatever form, that have any tendency to establish the actual or intended physical location of its user, or that of any of their associates involved in criminal activity, as well as the physical location of **Target Telephone 1, Target Telephone 2,** and the **Target iPad**;

2. Evidence of user attribution showing who used or owned **Target Telephone 1, Target Telephone 2,** and the **Target iPad** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.